T.C. Memo. 2010-251

UNITED STATES TAX COURT

VICTOR AND DELLA JENKINS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21092-08.                  Filed November 17, 2010.

Victor and Della Jenkins, pro se.

<u>Matthew D. Carlson</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, <u>Judge</u>:  The petitioners, Victor and Della Jenkins
(the "Jenkinses"), filed a joint tax return for the year 2006.
Respondent, whom we will refer to as the IRS, issued a deficiency
notice determining a deficiency of $98,479, and a section 6662(a)
penalty of $19,695.80.  The Jenkinses filed a petition with the
Tax Court seeking a redetermination.  The IRS now concedes the

correctness of charitable-contribution and home-mortgage deductions that the Jenkinses claimed on their return. After taking into account these two concessions, the remaining issues for us to decide include: (1) the amount of the deduction to which the Jenkinses are entitled for payments to a loan processor (we find the amount is $156,970.89), (2) whether the Jenkinses are entitled to deduct $16,418 in other business expenses (we find they are not), and (3) whether the Jenkinses are liable for the accuracy-related penalty under section 6662(a) (we find that they are). All of the other unresolved issues involve matters that should be resolved in the Rule 155 computations. These computational issues are: (1) whether the self-employment tax should be increased to $17,603, (2) whether the self-employment tax deduction should be increased to $8,802, and (3) whether the Jenkinses are entitled to itemized deductions as opposed to the standard deduction.

FINDINGS OF FACT

During 2006 Victor Jenkins ("Jenkins") worked as a registered nurse for a company called Nursefinders, Inc. In 2006 Jenkins received $41,929 in wages from Nursefinders, Inc. The tax treatment of these wages is not in dispute. Jenkins also worked as a loan officer during 2006.

In his capacity as a loan officer Jenkins worked with two mortgage brokers: American Dream Homes, and Living American

Dreams, Inc.[1] The two brokers compensated Jenkins by writing him commission checks.[2] We refer to these commission checks as "broker checks".

Jenkins worked with a loan processor named Therriman Edwards.[3] Jenkins and Edwards had an arrangement whereby the two men split the amount of each broker check that Jenkins received. Edwards was the key man in bringing in the business. Therefore, Edwards received the larger percentage of the net profit attributable to the broker checks. The primary reason that Jenkins received any share at all was that he held a California real-estate license. This permitted Jenkins to work as a loan officer. Edwards did not have a real-estate license.

Jenkins testified that his own share of a broker check was equal to 10 percent of the difference between the broker check and Edwards' out-of-pocket costs. Jenkins testified that Edwards' share of the broker check was equal to (1) Edwards' out-of-pocket costs plus (2) 90 percent of the difference between the broker check and Edwards' costs. As we explain later, we do not

---

[1]A mortgage broker hires a loan officer with respect to each loan transaction.

[2]A mortgage lender works with various mortgage brokers and compensates these mortgage brokers with commission payments. In 2006 a typical commission payment to a mortgage broker was 2 to 3 percent of the loan amount. The amounts of the checks that the two brokers wrote to Jenkins were 90 percent of the amounts that the brokers received from mortgage lenders.

[3]A loan officer works with a loan processor.

think that the amounts paid to Edwards were determined by this formula.

Jenkins used a bank account at Washington Mutual for both his loan officer business and his personal business.  The bank statements for this account and copies of checks drawn on this account provide some information about the amounts of the payments that Jenkins made to Edwards.

Jenkins received an information return, a Form 1099-MISC, Miscellaneous Income, from American Dream Homes showing that American Dream Homes paid him $94,081.45 in 2006.  He received another information return from Living American Dreams, Inc. showing that Living American Dreams, Inc., paid him $124,571.79 in 2006.  The total of those two numbers is $218,653.24.

Jenkins provided Edwards a Form 1099-MISC for the tax year 2006 showing $196,787.92 in the box for "Nonemployee compensation".  Jenkins arrived at $196,787.92 by multiplying 90 percent by the $218,653.24 that the two brokers reported that they had paid him.

The Jenkinses filed a Form 1040, U.S. Individual Income Tax Return, for 2006.  They attached a Schedule C, Profit or Loss Frm Business, for a business that they described as the "Mortgage Lender" business.[4]  On the Schedule C the Jenkinses reported

---

[4]The "Mortgage Lender" label was erroneous.  Jenkins did not act as a mortgage lender but as a loan officer.

gross receipts of $221,131 and gross income of $221,131. They reported total expenses of $213,206, of which $196,788 was "Wages". As Jenkins would explain to the Court, this $196,788 represented the payments he made to Edwards. Besides the $196,788, the remainder of the Schedule C expenses was $16,418. This $16,418 in expenses was described on the return only in broad categories and their corresponding amounts. The names of the categories and the amounts are listed later in our opinion. The trial record does not reveal any other information about these amounts. The net profit from the business was reported as $7,925, which is $221,131 minus $213,206. The IRS does not contest the accuracy of the $221,131 that the Jenkinses reported as gross income and gross receipts from the business.

Edwards filed a 2006 income-tax return with the IRS. He reported that he earned $96,788 in gross receipts. Suspiciously, this number is precisely $100,000 less than the $196,788 that Jenkins claimed as a deduction for "Wages".

The IRS sent a deficiency notice to the Jenkinses determining a deficiency of $98,479 and a section 6662(a) penalty of $19,695.80. One of the adjustments in the deficiency notice was the reduction of the $213,206 that the Jenkinses had claimed for Schedule C deductions to zero. The deficiency notice explained that "the record keeping requirements under Internal Revenue Code Section 6001 have not been met, and you have not

complied with our request for substantiation of your Schedule C".
The IRS now concedes that Jenkins paid Edwards commissions of
$69,325 during tax year 2006 and that Jenkins is entitled to a
business deduction of that amount. At the time the Jenkinses
filed their petition, they resided in California.

OPINION

1. Amount of Deduction for Jenkins' Payments to Edwards

   a. The Nine Payments Documented by Copies of Jenkins'
      Personal Checks to Edwards and Corresponding Entries on
      Bank Statements

The trial record contains copies of nine checks Jenkins
wrote to Edwards. These checks were drawn on Jenkins' Washington
Mutual bank account. For each check, the bank statements
reflect, under the heading "Checks Paid", the check number, the
check amount, and the payment date. Each of these items is
consistent with the information on the copies of the checks.
Other entries on the bank statement show that a "Customer
Deposit" was made on the same date (or almost the same date) as
the payment date of each check. The amount of each "Customer
Deposit" entry is somewhat greater than the amount of the
corresponding check.

For example, check No. 1012, dated March 2, 2006, is made
out from Jenkins to Edwards. The amount on the check is $10,000.
The bank statement contains a corresponding entry, under the
heading of "Checks Paid", for check No. "1012", a date of March

3, 2006, and an amount of $10,000.  The bank statement contains an entry on March 2, 2006 for a "Customer Deposit" of $11,920.50.

Including the example described above, there were nine transactions in which the documentation is similar.  They are summarized as follows:

Nine Payments to Edwards Evidenced by Checks to Edwards and Simultaneous
Large Deposits to Jenkins' Bank Account

| Date and Amount of "Customer Deposit" Entry on Bank Statement | Information on Check to Edwards | Bank Statement Entry for Same Check | Amount of Payment to Edwards (as claimed by Jenkins - identical to amounts conceded to be correct by IRS) |
|---|---|---|---|
| 3/2/06 $11,920.50 | Check #1012 3/2/06 $10,000 | Check #1012 3/3/06 $10,000 | $10,000 |
| 7/25/06 $9,791 | Check #1034 7/25/06 $8,191 | Check #1034 7/25/06 $8,191 | 8,191 |
| 7/31/06 $13,914 | Check #1032 7/31/06 $12,942 | Check #1032 7/31/06 $12,942 | 12,942 |
| 8/1/06 $9,396 | Check #1033 8/1/06 $8,600 | Check #1033 8/1/06 $8,600 | 8,600 |
| 8/16/06 $5,189.40 | Check #1037 8/16/06 $4,929 | Check #1037 8/16/06 $4,929 | 4,929 |
| 8/30/06 $2,250 | Check #1036 8/30/06 $2,125 | Check #1036 8/30/06 $2,125 | 2,125 |
| 9/1/06 $10,168.56 | Check #1038 9/1/06 $9,380 | Check #1038 9/1/06 $9,380 | 9,380 |
| 10/18/06 $8,758.63 | Check #1047 10/17/06 $8,075 | Check #1047 10/18/06 $8,075 | 8,075 |
| 11/9/06 $5,533.20 | Check #1046 11/8/06 $5,083 | Check #1046 11/9/06 $5,083 | 5,083 |
| Total | | | 69,325 |

The IRS has conceded that Jenkins is entitled to deduct $69,325
for his payments to Edwards.  This is the total amount of these
nine checks.

b.  Seven Payments to Edwards Documented by Entries for
    Large Deposits to and Large Withdrawals from Jenkins'
    Account

There are seven instances in which Jenkins' bank statement has an entry for a "Customer Deposit" and, on the same date, a withdrawal.  The amount of each withdrawal is a relatively large fraction of the amount of the corresponding "Customer Deposit".  For example, the Washington Mutual bank statement shows that on April 12, 2006, there was a "Customer Deposit" of $12,797.44.  It also shows that on 4/12/06, there was a "Transfer Withdrawal" of $11,517.44.

Jenkins testified that the $12,797.44 deposit entry reflected that he had deposited a broker check in that amount. He testified that the entry for a "Transfer Withdrawal" of $11,517.44 reflected that he transferred that amount from his bank account at Washington Mutual to Edwards' account at the same bank.  The IRS argues that the documentary evidence is inadequate to support the proposition that Jenkins made a payment of $11,517.44 to Edwards.  We find, however, that the bank statement, combined with Jenkins' testimony, is sufficient to demonstrate that Jenkins paid Edwards the $11,517.44 recorded on the bank statement.  We make a similar conclusion for six other

payments for which there is similar documentary and testimonial evidence. All seven payments can be summarized thus:

Seven Payments to Edwards Evidenced by Entries for Large Deposits and Large Withdrawals

| Date and Amount of "Customer Deposit" Entry on Bank Statement | Date and Amount of "Transfer Withdrawal" or "Customer Withdrawal" Entry on Bank Statement | Amount Paid to Edwards (as claimed by Jenkins – identical to amounts determined by the Court) |
|---|---|---|
| 4/12/06 $12,797.44 | 4/12/06 (Transfer withdrawal) $11,517.44 | $11,517.44 |
| 4/21/06 $12,011.57 | 4/21/06 (Transfer withdrawal) $11,281 | 11,281.00 |
| 4/25/06 $10,099.13 | 4/25/06 (Customer withdrawal) $9,144 | 9,144.00 |
| 6/2/06 $14,536.04 | 6/2/06 (Customer withdrawal) $13,947.69 | 13,947.69 |
| 6/2/06 $7,906.50 | 6/2/06 (Customer withdrawal) $7,645.50 | 7,645.50 |
| 6/27/06 $10,636.86 | 6/27/06 (Customer withdrawal) $9,483 | 9,483.00 |
| 10/3/06 $9,756.40 | 10/3/06 (Transfer withdrawal) $9,088 | 9,088.00 |
| Total | | 72,106.63 |

c. <u>Three Payments From Jenkins to Edwards Documented by an Entry in the Bank Statement Showing That Jenkins Deposited a Small Amount</u>

There are three transactions for which the sole written evidence of a payment from Jenkins to Edwards is entries on Jenkins' Washington Mutual bank statement showing that there were three relatively small customer deposits made to Jenkins' bank account. For example, the bank statement reflects that a

"Customer Deposit" of $1,137 was made on March 17, 2006. On the basis of this $1,137 entry, Jenkins testified that he must have received a check from the broker for $11,370; i.e., $1,137 divided by 10 percent. Jenkins cashed the broker check rather than depositing it, which explains why there is no bank statement entry corresponding to the amount of the broker check. Of the $11,370 that he estimated was the proceeds from the cashing of the broker check, Jenkins said that he gave Edwards 90 percent; i.e., $10,233. He said that he deposited to his own bank account the remaining 10 percent; i.e., $1,137. Jenkins gave similar testimony with respect to two other transactions for which the written documentation is comparable to this one. He estimated that for all three transactions, his total payments to Edwards were $26,894.88.

We believe that the entry for a deposit of $1,137 to the Washington Mutual bank account reflected Jenkins' share of a broker check. We also believe that around the time of this deposit, Jenkins paid Edwards for Edwards' share of the broker check. However, we come to a different conclusion from Jenkins' regarding how much Jenkins paid Edwards. The method used by Jenkins is unacceptable. If one attempts to apply this method to other payments to Edwards for which there is documentary evidence as to the actual amount, the method fails to predict the actual amount. For example, as we have found, Jenkins received a broker

check of $11,920.50 and paid Edwards $10,000 from that check.

Yet the method Jenkins used would have predicted that Edwards'

share would be $10,728.45 ($11,920.50 times 90 percent).  To take

another example, we found that Jenkins received a broker check of

$9,791 and paid Edwards $8,191.  Yet the method Jenkins used

would have predicted $8,812.  We therefore find the method

unreliable.[5]

If a taxpayer is entitled to a deduction, but it is not

possible to determine the exact amount of the deduction, the Tax

Court may estimate the amount.  <u>Cohan v. Commissioner</u>, 39 F.2d

540, 543-544 (2d Cir. 1930).  In making this estimate, the Court

may resolve uncertainties against the taxpayer, because it is the

taxpayer's fault that there is not enough information to

accurately calculate the deduction.  <u>Id.</u>  For the reasons set

forth below, we have decided to determine the amount of each of

---

[5]In determining the amounts of the three payments to
Edwards, we did not rely on Jenkins' testimony that Edwards'
share of each broker check was equal to Edwards' costs plus 90
percent of the difference between the broker check and his costs.
This amount is mathematically equivalent to 90 percent of the
broker check, plus 10 percent of his costs.  (Suppose that $b$ is
the amount of the broker check, $c$ is Edwards' out-of-pocket
costs, and $e$ is Edwards' share of the broker check.  Jenkins
testified that:  $e = c + .9(b-c)$.  This is algebraically
equivalent to:  $e = .9b + .1c$.)  But if we apply this formula to
the $11,920.50 broker check, the formula would predict that
Edwards would receive 90 percent of the broker check (i.e.
$10,728.45) plus costs.  But in fact Edwards actually received
only $10,000.  Therefore, the formula is incorrect.  And, even if
the formula was correct, we would not have enough information to
use the formula.  One of the terms of the formula is Edwards'
costs.  We do not know this amount.

the three payments to Edwards by multiplying the amount of each corresponding deposit by 5.2.

The derivation of the 5.2:1 ratio is as follows.  For each of the 16 transactions for which we have already determined the amount that Jenkins paid Edwards, we calculated the ratio between Jenkins' share of the broker check and Edwards' share of the broker check.  The transactions for which the ratio was the highest were (1) the $11,920.50 broker check deposited on March 2, 2006, of which Edwards' share, $10,000, bears approximately a 5.2 ratio to Jenkins' share, $1,920.50, and (2) the $9,791 broker check deposited on July 25, 2006, of which Edwards' share, $8,191, bears approximately a 5.1 ratio to Jenkins' share, $1,600.

Using this 5.2 ratio, we find that:  (1) the $1,137 deposit Jenkins made on March 17, 2006, corresponded to a $5,912.40 payment to Edwards, (2) the $793.27 deposit Jenkins made on March 17, 2006, corresponded to a $4,125 payment to Edwards, and (3) the $1,058.05 deposit Jenkins made on March 30, 2006, corresponded to a $5,501.86 payment to Edwards.  The total of these three payments is $15,539.26.

The IRS's position is that we should be making no estimate at all and that the deduction for these three transactions should be zero.  It points out there is no written evidence proving that the three deposits actually represented Jenkins' shares of the

broker checks and no written evidence that Jenkins made a corresponding payment to Edwards for Edwards' share. But, as we noted above, we believe Jenkins' testimony that the deposits to his account did correspond to broker checks and that he made corresponding payments to Edwards. We have estimated the payments to Edwards in these three transactions.

The three transactions discussed in this section can be summarized as follows:

Three Payments to Edwards Evidenced In Writing by Small "Customer Deposit" Entries

| Date and Amount of "Customer Deposit" Entry on Bank Statement | Amount of Broker Check (per Jenkins) | Amount of Payment to Edwards (per Jenkins) | Amount of Payment to Edwards (Per Court) |
|---|---|---|---|
| 3/17/06 $1,137 | $11,370 ($1,137/10%) | $10,233 (90% of $11,370) | $5,912.40 ($1,137*5.2) |
| 3/17/06 $793.27 | $7,932.70 ($793.27/10%) | $7,139.43 (90% of $7,932.70) | $4,125.00 ($793.27*5.2) |
| 3/30/06 $1,058.05 | $10,580.50 ($1,058.05/ 10%) | $9,522.45 ($10,580.50) | $5,501.86 ($1,058.05*5.2) |
| Total Deposits = $2,988.32 | | Total= $26,894.88 | Total= $15,539.26 |

d.   Conclusion

Of the three categories of payments described above, we have determined that Jenkins is entitled to a deduction of $156,970.89 ($69,325 + $72,106.63 + $15,539.26).  This figure is less than the $168,326.51 amount claimed by Jenkins.[6]  It is greater than the corresponding amount urged by the IRS, $69,345.  We are not persuaded that Jenkins made any payments to Edwards other than the 19 discussed in this opinion.

2.   Remaining Schedule C Expenses

Of the $213,206 in expenses claimed as deductions on the Schedule C, $196,788 was labeled "Wages".  The rest of the expenses, amounting to $16,418, were described on the tax return as:

| | |
|---|---:|
| Car and truck expense | $2,546 |
| Insurance (other than health) | 81 |
| Rent or lease (other business property) | 500 |
| Supplies | 130 |
| Taxes and licenses | 76 |
| Utilities | 286 |
| Business credit card | 10,450 |
| Car rental | 127 |
| Seminar airfare | 1,134 |
| Hotel | 337 |
| Ink cartilages (sic) | 160 |
| Business cards | 100 |
| Real estate book | 491 |
| Total | 16,418 |

---

[6]Jenkins did not argue that his payments to Edwards were equal to $196,787.92, the amount that Jenkins deducted on his return for these payments.

Even though he claimed the $16,418 in expenses on his Schedule C, Jenkins did not introduce any evidence to prove that he was entitled to deduct it.[7] We sustain the IRS's determination in its deficiency notice that the remaining Schedule C deductions should be disallowed.

3.  The Section 6662(a) Penalty

The IRS bears the burden of producing evidence that the Jenkinses are liable for the section 6662(a) penalty. See sec. 7491(c). The Jenkinses were negligent within the meaning of section 6662(c). Their recordkeeping was extremely poor. The IRS has carried its burden of producing evidence. The portion of the underpayment attributable to the Schedule C deductions that the Jenkinses erroneously claimed was due to negligence.

The disallowed Schedule C deductions also resulted in an "understatement" of income tax within the meaning of section 6662(d)(2). Whether there is a "substantial understatement" of income tax within the meaning of section 6662(d)(1)(A) is a mathematical matter to be resolved after the parties have completed Rule 155 computations.

---

[7]Instead, Jenkins introduced into evidence a list of expenses that he says he could have deducted but did not. The purpose of the exhibit was to show the Court that his handling of his tax return showed indifference rather than any sort of fraudulent intent. He did not ask the Court to incorporate the new deductions on the exhibit into its determination of his tax liability. In any event, that spartan list of additional deductions would not have proven he was entitled to the additional deductions.

The Jenkinses have the burden of proving that they are not liable for the penalty because of reasonable cause, substantial authority, or a similar provision.  See <u>Higbee v. Commissioner</u>, 116 T.C. 438, 447 (2001).  They have not satisfied their burden of proof.

<u>Decision will be entered under Rule 155</u>.